R. B. LEACH, Plaintiff-in-Error, v. R. L. WILES, d/b/a
Capitol City Grain Company and Bill Keith, d/b/a
Hickman County Feed Company, Defendants-in-Error.
—429 S.W.(2d) 823.

Middle Section. January 5, 1968.

Certiorari Denied by Supreme Court June 17, 1968.

288

MacFarland & Colley, Columbia, for plaintiff-in-error.

Keaton & Haggard, Hohenwald and Waynesboro, for R. L. Wiles d/b/a Capitol City Grain Co.

Emery B. Gill, Centerville, for Bill Keith, d/b/a Hickman County Feed Co.

PURYEAR, J. The plaintiff-in-error here was the plaintiff below and the defendants-in-error were the defendants below, so we will simply refer to them here as plaintiff and defendants, respectively.

This is a suit for property damages resulting from the death of two pony stallions, which the plaintiff, R. B. Leach, insists was caused by some harmful substance contained in crimped oats processed by the defendant, R. L. Wiles d/b/a Capitol City Grain Company, and purchased by plaintiff from the defendant Bill Keith, d/b/a Hickman County Feed Company.

The declaration, as amended, contains two counts, the first of which is a negligence count alleging that the crimped oats processed or manufactured by the defendant, Wiles, and sold to the plaintiff by the defendant, Keith, were of inferior and impure quality because of the negligence of said defendants and such oats contained a toxic poison resulting in the death of the two registered Shetland pony stallions to which the oats were fed.

The second count of the declaration is based upon alleged breach of implied warranty and, as originally filed, alleged that such implied warranty arose under T.C.A. Section 47-1215, which is part of the old Uniform Sales of Goods Act. However, this count of the declaration was later amended so as to base this count upon implied warranty arising under Sections 47-2-314 and 47-2-315 T.C.A. which are portions of the Uniform Commercial Code, now in effect and also in effect at the time of the alleged sale of said crimped oats to the plaintiff on July 7, 1964.

However, the plaintiff has now abandoned reliance upon the first count, which was the negligence count, and bases his case entirely upon the second count of the declaration which alleges breach of implied warranty under the two above mentioned sections of the Uniform Commercial Code.

To this declaration, both defendants filed general issue pleas of not guilty and the case was tried before the Circuit Judge, Honorable John H. Henderson, and a jury.

At the conclusion of all the plaintiff's proof, which was all of the evidence introduced in the case, both defendants moved for directed verdicts, which motions were sustained and the trial Judge directed verdicts in favor of both defendants.

The plaintiff then filed motion for a new trial, which was overruled by the trial Court, and plaintiff has now perfected his appeal in error to this Court and filed four assignments of error.

A total of six witnesses testified at the trial, but the testimony of two of them namely, Dr. Luther Mullins and Mr. Frank Willard, was principally for the purpose of

proving the value of the two pony stallions and, therefore, their testimony is not relevant to the matters presented upon this appeal.

The plaintiff, R. B. Leach, testified that he had been in the business of raising show ponies for about ten years and that he regularly did business with the defendant, Bill Keith, d/b/a Hickman County Feed Company; that he bought crimped oats and Omolene from Keith on July 7, 1964, but these feeds were not delivered to him until July 11, 1964; that on or about July 12, 1964, he fed the oats, which are simply crushed oats, together with Omolene, and Clovite (a vitamin) to the two pony stallions, but did not feed any of such oats to any of his other ponies. One of these stallions was three years old and the other ten years old.

On July 15, 1964, plaintiff noticed that the three year old stallion did not want to eat, but the other did and at that time he saw no other symptoms of anything being wrong with either of them.

On July 16, 1964, the three year old stallion died and at this time, plaintiff turned the ten year old out to pasture and this ten year old stallion was found dead July 19, 1964, but it does not appear just how long he had been dead at the time he was found.

On July 16, 1964, plaintiff took the body of the three year old pony to the Ellington Agricultural Center at Nashville, where a State Veterinarian performed an autopsy. At some time thereafter plaintiff took samples of the crimped oats, Omolene and Clovite, together with hay and straw that were used for bedding, to Doctor James Wilson, who is Assistant Professor of Bio-chemistry and an expert on toxic feed diseases in livestock.

Plaintiff also testified that after he purchased the crimped oats from Bill Keith, he poured them into metal drums before feeding them to the ponies and before feeding them he mixed the oats, Omolene and Clovite in a feed bucket which was not cleaned prior to feeding.

Plaintiff testified that at the time he fed the oats to the ponies, he noticed nothing unusual about them which could be detected by sight or sense of smell and that they did not appear to be molded at that time.

Plaintiff testified that he did not know exactly when he took the feed and bedding samples to Doctor Wilson, but thought it was a few days after the ponies died. Later, however, he testified it might have been as long as three or four weeks after the death of the ponies before he took the samples to Doctor Wilson.

The next witness, Doctor Luther Mullins, a dentist of Fairview, Tennessee, testified that he sold the three year old pony to plaintiff in 1963, and since most of his testimony relates to the value of the ponies, we will not summarize it here.

The next witness, Mr. Frank Willard, of Franklin, Tennessee, testified as to the value of the ponies and, therefore, his testimony will not be summarized.

The next witness, Doctor James Wilson, a Bio-chemist at Vanderbilt Hospital, testified that he is principally concerned with research of molds that are related or particularly related to moldy feed disease of animals; that plaintiff was referred to him by Doctor Mullins, who had an outbreak of toxic feed disease among his own ponies; that he began the experiment on the feed and bedding furnished to him "some time before August 10, 1964" and continued thereafter, the first test being made

for the purpose of determining if any toxic material was present in the feeds and such tests showed there was no definite evidence of toxic material present in the oats or Clovite, but there was apparently some toxic material in the Omolene.

He found molds present in the oats and Omolene, the latter being a sweet feed with molasses in it, and also contains corn and oats, and because of his testimony on this particular phase of the case is important, we quote it as follows:

"Q. Now what is the next procedure or what do you do to determine whether or not the molds are toxic and would be injurious?

A. After isolation of the molds, that is after getting them out in pure culture they are then inoculated or allowed to grow on a moistened food material, usually something very close to it not identical to the type of food from which they were isolated.

Q. Did you do that with the molds in these three cases here?

A. Yes, we grew from the oats, we isolated two closely related fungi—

Q. Now what is a fungi?

A. A mold.

Q. A mold, all right.

A. Which when grown out on wheat and corn, mixture of these two substances, produced some as yet unidentified toxic substance.

Q. Did you also grow out the mold that you found on Omolene and Clovite?

A. Yes, but we did not have any definite indication that these were toxigenic but some of them were of the same species—

Q. Same species of mold?

A. As the type usually involved in toxic disease outbreaks but I must emphasize that they did not prove to be toxigenic in our experience which was quite surprising to us.

Q. But oats, the mold on the oats did prove toxic type?

A. That's correct.

Q. Now how do you know that they were toxic?

A. We fed the extracts from the Laboratory cultures of these molds growing on the wheat and corn, and fed the extracts to mice and mice would die within a period of perhaps a few minutes up to maybe several hours or maybe a day.

Q. In examining the dead mouse or mice what did you find that was significant in so far as this is concerned?

A. Well the most notable things was an acute distention of the intestinal tract.

Q. By distention you mean swelling?

A. Distention apparently with gas of some sort which is rather unusual reaction, we had never seen this before in any of our studies. In addition we noticed that the lungs were in most cases congested or by congested I mean having an unusually large amount of blood in the vessels or else they showed evidence of hemorrhage. Also the kidneys of these animals appeared to contain hemorrhages.

Q. How much of the substance would you feed to a mouse?

A. Well we would usually give a mouse half of a millimeter or the suspension of the extract as we made it up.

Q. How much is that?

A. Well its a very small amount but it would represent a good bit of the feed material. So its hard to relate it precisely.

Q. And how long would a mouse live after consuming this?

A. In some cases only a few minutes and in some cases maybe over night.

Q. Did all the mice die?

A. Just about I think in almost every case." (B. of E. pp. 143, 144, 145)

This witness further testified that he was not able to tell how long these feeds had been contaminated before he examined them and said that they might have been contaminated a long time before he received them or a short time, but that the toxin is most evident after the mold has grown a week or two.

The next witness, Doctor L. W. Turner, a veterinarian employed by the State of Tennessee at the Ellington Agricultural Center in Nashville, testified that the body of the three year old pony was brought to him for autopsy on July 16, 1964, at which time he performed such autopsy, as a result of which he made the following findings:

That the intestines were distended with gas; that the mucus membrane of the large intestines was highly con-

gested; found some hemorrhage and early necrosis in the kidneys; cloudy swelling and hemorrhage in the liver and that the pony died due to autointoxication as a result of a digestive upset.

This witness testified that he could not tell from his examination what was the primary cause of death of the pony, except to say that it was a digestive upset and that a digestive upset of a pony is a common thing.

The defendant, Bill Keith, who was called as a witness by the plaintiff, testified that he purchased 1500 pounds of crimped oats in bags from the defendant, Wiles, and that they were delivered to him on or about June 11, 1964; that he stored them on wooden pallets on a concrete floor in his place of business so that the oats would stay dry and away from rats.

He described the oats as being in 100 pound burlap bags with sewing across the top and they were in that same condition when he sold them to plaintiff; that he sold a 100 pound bag of such crimped oats to plaintiff on July 7, 1964, and admitted that he knew the purpose for which plaintiff was purchasing them, (See B. of E. p. 188) and that the particular oats that he sold the plaintiff at that time were purchased by him from Wiles on or about June 11, 1964.

Mr. Keith also testified that he had previously sold plaintiff some of this same lot of oats on or about June 25, 1964, and some of this same lot had been sold to other customers.

It was stipulated by and between counsel that Roy Williams, John Tidwell and John Orton, other customers of the defendant, Keith, if called to testify, would say that they bought crimped oats from Keith on the 23rd

day of June, 1964, the 11th day of June, 1964, and the 26th day of June, 1964 and fed them to livestock owned by them, and that none of such livestock became sick as a result thereof; that John Orton fed the crimped oats to 4H club calves; that John Tidwell fed them to 4H club calves and that Roy Williams fed them to cattle and three ponies.

The foregoing is a summary of all of the evidence in the case, at the conclusion of which the trial Judge directed a verdict in favor of both defendants.

Although, the plaintiff has filed four assignments of error, all of them are based upon the general premise that it was error for the trial Judge to direct verdicts in favor of both defendants, and, therefore, we will not discuss the assignments separately.

Plaintiff's counsel strenuously insist that the evidence made questions of fact which required the case to be submitted to the jury on the theory that the jury could have found from such evidence there was an implied breach of warranty on the part of both defendants, which resulted in property damage to plaintiff and therefore, the Court should not have directed a verdict.

Of course, in determining whether or not error was committed by the trial Judge in directing a verdict, we are governed by the often repeated rule that in determining a motion for a directed verdict, the trial Judge and the reviewing Court on appeal, must look to all of the evidence, take the strongest legitimate view of it in favor of the opponent of the motion, and to allow all reasonable inferences from it in his favor; to discard all countervailing evidence, and if then, there is any dispute as to any material determinative evidence, or any doubt as to

the conclusion to be drawn from the whole evidence, the motion must be denied. General Motors Corp. v. Dodson, 47 Tenn.App. 438, 328 S.W.2d 655; Poole v. First National Bank, 29 Tenn.App. 327, 196 S.W.2d 563, and many other cases, some of which are cited by counsel for plaintiff.

Of course, privity of contract is not disputed by the defendant, Keith, because, the oats were actually purchased from him by plaintiff, but, in an attempt to take the case against Wiles to the jury, plaintiff's counsel strenuously argue that, the Supreme Court, in its decision in Ford Motor Company v. Lonon, 217 Tenn. 400, 398 S.W.2d 240, paved the way for submission of this case against Wiles to the jury although there was no privity of contract between plaintiff and Wiles. Counsel insist that, in spite of absence of such privity of contract between a manufacturer or processor and the ultimate purchaser, there now exists such an implied warranty, under and by virtue of T.C.A. Sections 47-2-314 and 47-2-315, which are as follows:

"47-2-314. *Implied warranty — Merchantability — Usage of trade.*—(1) Unless excluded or modified (sec. 47-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

(3) Unless excluded or modified (sec. 47-2-316) other implied warranties may arise from course of dealing or usage of trade."

"47-2-315. *Implied warranty—Fitness for particular purpose.*—Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

Plaintiff's counsel also insist that we should consider another section of the Uniform Commercial Code, it being 47-2-318, which provides as follows:

"47-2-318. *Third party beneficiaries of warranties express or implied.*—A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods *and who*

*is injured in person* by breach of the warranty. A seller may not exclude or limit the operation of this section." (emphasis supplied)

█ It is to be noted that Section 47-2-318 only applies to personal injury cases and, therefore, has no application in the instant case, but we will discuss it later in this opinion.

After considering the evidence in this case and taking the strongest legitimate view of it in favor of plaintiff and allowing all reasonable inferences from it in his favor, we think the trial Judge properly directed a verdict.

In Ford Motor Co. v. Lonon, supra, the Supreme Court based its decision squarely upon the theory that the manufacturer of a tractor, manufactured by Ford and sold to Lonon by a dealer, had made material misrepresentations upon which Lonon, the ultimate purchaser, relied.

This appears from the following language of the Court's opinion in that case:

"Since, however, the decision in the present case is based on the ground that the manufacturer has committed the tort of misrepresentation rather than a breach of warranty under the Uniform Sales Act, it is not necessary to say to what extent privity requirements are to be dispensed with under the Sales Act, which was in effect at the time of this transaction." Ford Motor Co. v. Lonon, supra, p. 417, 398 S.W.2d p. 247.

The Court then went further and said:

"We think that the result obtained in the Dodson case is sound. As indicated in this opinion, however, we

would prefer to place that result not on warranty grounds, but on the misrepresentation theory recently developed in the above quoted 2 Restatement (Second) Torts, sec. 402B (1965). Furthermore, since in the Dodson case the automobile involved was not only defective but unreasonably dangerous, we think that liability in that case could properly be placed also in 2 Restatement (Second) Torts, sec. 402A (1965), which does not require any misrepresentation by the manufacturer. Section 402A is based on the concept that whenever a manufacturer or other supplier places on the market a chattel which is defective and unreasonably dangerous to potential users, and harm does result from the defect, while the product is in normal use, the manufacturer should incur a strict liability in tort, apart from any warranties or representations which he may have made. This section reads as follows:

Sec. 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property if

(a) the seller is engaged in the business of selling a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.'

It should be noted that the above section requires the plaintiff to establish that the product, when it left the hands of the manufacturer or other supplier, was at that time in both a defective and unreasonably dangerous condition.'' pp. 419-420, 398 S.W.2d. p. 248.

\* \* \* \* \* \*

''There seems to be no unfairness in holding that a manufacturer who markets a product which is not only defective but unreasonably dangerous should be responsible for any physical harm which results to person or property, even though no privity of contract and no negligence can be established. It might be added that where the plaintiff can sustain the heavy burden of showing, as he must, that the product was in a dangerously defective condition at the time it left the hands of the manufacturer, it is quite likely that some negligence was involved even though this cannot be proved. See Wade, supra, 19 Sw.L.J. 5, (1965); Noel, Products Liability of Manufacturers—To Manufacturers of Products—The Drift Toward Strict Liability, 24 Tenn.L.Rev. 963, 1012-13 (1957).'' Ford Motor Co. v. Lonon, supra, pp. 421, 422, 398 S.W.2d p. 249.

In considering the effect of Ford Motor Company v. Lonon, supra, we must also consider the later case of Olney v. Beaman Bottling Company, 220 Tenn. 459, 418 S.W.2d 430, (opinion filed June 26, 1967).

In that case, plaintiff, Mrs. Olney, sued Beaman Bottling Company for damages arising out of the drinking of a soft drink which contained large amounts of

partially decayed material resembling tobacco. A demurrer was sustained by the trial Court, which ruling was affirmed by the Supreme Court, and in holding the declaration to be insufficient, the Supreme Court said:

"We recognize that strict liability exists upon the manufacturer of a product without fault on his part, under the circumstances outlined in 2 RESTATE-MENT, Second, Torts sec. 402-A (1965). This result was foreshadowed by the opinion of this Court in the case of Ford Motor Company v. Lonon, 217 Tenn. 400, .398 S.W.2d 240 (1966). This is a development in the law of torts which seems justified where the conditions specified in the RESTATEMENT are established by proof.

This liability, however, is not liability for breach of warranty as that term has been known and used generally. See Comment M to RESTATEMENT, Second, Torts, sec. 402-A. This Court held in Coca-Cola Bottling Works v. Sullivan, 178 Tenn. 405, 158 S.W.2d 721, 171 A.L.R. 1200 (1942), and in earlier cases, that there is no implied warranty where there is no privity of contract, and that there is no implied warranty of fitness running with a product from the manufacturer to the consumer. To the extent of this holding, Sullivan and its predecessor are still good law and have not been disturbed by subsequent cases in this jurisdiction. See Kyker v. General Motors Corp., 214 Tenn. 521, 381 S.W.2d 884 (1964); Oliver Corp. v. Green, 54 Tenn. App. 647, 393 S.W.2d 625 (1965).

To the extent that Sullivan required proof of negligence, of course, it is modified by the adoption of strict liability as outlined in the RESTATEMENT, supra.

As noted in the RESTATEMENT, however, strict liability is imposed upon one who sells a product 'in a defective condition unreasonably dangerous to the user or consumer or to his property.' We approve this principle where appropriate, but the declaration in the present case barely even says that the defendant was the manufacturer or processor of the product. *It wholly fails to allege that the product was defective when it left the hands of the manufacturer, and that it was then in a dangerous condition.* The allegations of the declaration have been quoted in their entirety above, except for the formal identification of the parties and the description of the injuries. We cannot read this declaration as stating a cause of action under RESTATEMENT, sec. 402-A." (emphasis supplied) Olney v. Beaman Bottling Co., supra, p. 431.

 Therefore, we must necessarily reach the conclusion that the rule requiring privity of contract between the parties as an essential element of implied warranty still exists in Tennessee, except in cases where the product involved is "in a defective condition unreasonably dangerous to the user or to his property."

However, the decisions of other States seem to be in conflict on the question and a recent study of such decisions indicates that the requirement of privity in implied warranty cases involving food products and other manufactured products, there seems to be a distinct trend on the part of the courts to repudiate the doctrine of privity of contract.

Such conflict as exists between the decisions of other States appears to be logically explained by the Municipal Court of Appeals for the District of Columbia in Picker X-Ray Corp. v. General Motors, 185 A.2d 919, (1962),

wherein that Court said the Uniform Commercial Code had not codified the doctrine of privity with respect to recovery on implied warranty and that this is left to the judiciary.

We do not agree with plaintiff's counsel that T.C.A. Section 47-2-318, which extends benefits of the warranty to guests of the purchaser and also to his family and members of his household in personal injury cases does, by implication, dispense with the requirement of privity between manufacturer and purchaser.

Pennsylvania was the first State to adopt the Uniform Commercial Code and the Supreme Court of that State held in 1963, that this particular section of the Code must be narrowly construed as shown by the following language in the opinion:

"It is clear from the language used that in order to qualify as a person (not a buyer), who is within the protection of the warranty, one must be a member of the buyer's family, his household or a guest in his home." Hochgertel v. Canada Dry Corp., 409 Pa. 610, 187 A.2d 575, p. 577.

Even if we should hold that the general rule of liability for implied breach of warranty could be extended and construed so as to apply in favor of a purchaser and against a manufacturer or processor between whom there is no privity of contract, (and we do not think we can so hold under our existing cases) it would avail the plaintiff nothing at all, since there is no evidence in the record from which the jury could find or reasonably infer that the oats failed to measure up to the requirements of T.C.A. Sections 47-2-314, and 47-2-315, or were "in a defective condition unreasonably dangerous" to the plaintiff's livestock, either at the time

they were purchased from Keith or supplied by Wiles to Keith.

As we understand it, our Supreme Court has gone no further than to hold that in the absence of contractual privity, liability can be imposed upon the manufacturer for breach of implied warranty when ''one sells any product in a defective condition unreasonably dangerous to the user or to his property'' as provided in 2 RE-STATEMENT (Second) Torts, sec. 402A (1965). See Ford Motor Co. v. Lonon, supra, 217 Tenn. at page 419, 398 S.W.2d 240, and Olney v. Beaman, supra, 220 Tenn. at page 463, 418 S.W.2d at page 431.

This rule, of course, places a much heavier burden of proof upon the purchaser than does the rule which allows recovery by the purchaser from his immediate seller under T.C.A. Sections 47-2-314 and 47-2-315 of the Uniform Commercial Code.

Even under the foregoing Sections of the Uniform Commercial Code, there can be no recovery by the purchaser from his immediate seller unless it is shown that the goods purchased did not measure up to the requirements of such implied warranty at the time such goods passed from the seller to the purchaser. This is the point at which the plaintiff's case against Keith fails to make an issue of fact for the jury.

For the foregoing reasons, we think the learned trial Judge correctly directed a verdict in favor of both defendants and the judgment of that Court will be affirmed with costs. The plaintiff will pay all of the costs of this appeal.

Shriver, P. J., and Todd, J., concur.