**GREAT AMERICAN MUSIC MACHINE, INC., and Ralph H. Harrison**

v.

**MID–SOUTH RECORD PRESSING COMPANY.**

Civ. No. 7074.

United States District Court, M. D. Tennessee, Nashville Division.

Jan. 30, 1975.

Alfred H. Knight, Nashville, Tenn., for plaintiffs.

W. Ovid Collins, Jr., Nashville, Tenn., for defendant.

## MEMORANDUM

MORTON, District Judge.

This suit is brought by plaintiffs Great American Music Machine, Inc. (GrAMM), a Colorado corporation, and Ralph Harrison, a citizen and resident of Colorado, against Mid-South Record Pressing Company, a division of GRT Corporation, with its principal place of business in Davidson County, Tennessee. The complaint seeks monetary damages, based upon breach of contract and implied warranty in connection with some record albums which plaintiffs allege were defectively pressed by Mid-South. The defendant counterclaims on its open account with the plaintiff corporation in the stipulated amount of thirteen thousand and twenty-five dollars and thirty-nine cents ($13,025.39). Jurisdiction of this court is properly invoked under 28 U.S.C. § 1332.

## FINDINGS OF FACT

In August of 1971, plaintiff Harrison and several of his close friends and business associates formed "Crossroads Limited Partnership," the predecessor to plaintiff corporation. The partnership was formed for the purpose of promoting and exploiting the musical talents of Harrison as a songwriter and singer, although he was then unknown in the entertainment field and had never performed professionally. The business plan of the partnership was to finance the production of a master tape for an album by Ralph Harrison, convert the partnership into a corporation, produce and promote the album and Harrison as an artist, and raise additional capital through a public offering of the stock of the corporation. GrAMM was incorporated by the Crossroads venture in March of 1972, and all the rights of Crossroads were merged into the new corporation.

In the fall of 1971, Harrison went to New York City to produce the master tape for an album featuring himself as the singing artist. The production cost of the master tape was thirty-one thousand and eighty-eight dollars ($31,088.-00). The title of the album was to be "Free Spirit Movin'."

In early February of 1972, Harrison and an investor in the venture came to Nashville, Tennessee, to contract for the pressing and packaging of the record album. On behalf of GrAMM, they contracted orally with the defendant, Mid-South Record Pressing Company, for the pressing of forty thousand (40,000) record albums, at a cost of thirteen thousand and twenty-five dollars and thirty-nine cents ($13,025.39). GrAMM received assurances that the records would be of high quality. Although there was some dispute in the testimony at trial, it appears to the satisfaction of this court that there was some discussion with Janet Tabor, manager of defendant company, concerning the overall business plan of GrAMM. It is the finding of this court that GrAMM's plan to offer stock

to the public in June of 1972 was mentioned in this discussion.

Under the terms of the oral agreement between the parties, Mid-South was to mail directly to members of ESA, a national sorority, some thirty-two thousand (32,000) copies of the album. (One of Harrison's songs on the record had been adopted by ESA as its theme song). GrAMM supplied the postage in advance for this mailing. To be enclosed with the albums sent to ESA members was a letter requesting that five dollars ($5.00) be remitted to GrAMM, of which one dollar ($1.00) would be donated to a certain service project of the sorority. The bulk of the remaining 8,000 albums was to be sent to Gambit Records, a Nashville company with whom GrAMM had contracted for nationwide distribution. By mid-February of 1972, a test pressing of good quality had been approved by GrAMM, and Mid-South commenced production of the album. Though there was some dispute in the testimony at trial, the court finds that the contemplated delivery date was the first week of April, 1972.

On April 3, 1972, GrAMM received a shipment of the records at its office in Denver, Colorado. At that time it was discovered by Harrison and others that the records were defective in that they were warped, pitted and blistered, producing excessive surface noises when played. GrAMM immediately sent two representatives to Nashville on April 4, 1972, to investigate the situation. Upon arrival, the GrAMM representatives learned that some eight thousand (8,000) of the records had already been shipped to ESA members; roughly four thousand (4,000) records had been delivered to Gambit, from which an undetermined number had been sent to distributors and disc jockeys around the country.

The court finds as a matter of fact that the first pressing of the record by Mid-South was for the most part commercially unacceptable. Witnesses for both the plaintiff and the defendant testified as to this fact. Gordon Close, one of the GrAMM representatives sent to Nashville in early April, and Janet Tabor of Mid-South both agreed that the larger part of the records still on hand at Mid-South were unusable and that the entire lot should be scrapped and new records pressed. To be included in the new pressing were replacements for the defective albums which had already been shipped out.

After the new records were pressed, the plaintiff did not complain of the quality of the second pressings. In fact, Gordon Close, who acted as plaintiff's quality control representative, testified that the re-pressing was completed to his expectations. Mr. Close called in Arnold Thies from Gambit to listen to random albums from the second pressing, and Mr. Thies also verified their high quality. The second pressing of the records appears to have been shipped out around the first of May, 1972.

Although GrAMM did not complain of the quality of the second pressing nor reject the second batch of albums, it has refused to pay its open account with Mid-South. The amount due on the account is $13,025.39.

In relation to the contemplated stock offering by GrAMM, plaintiff introduced evidence at trial attempting to show that Mr. Mike McBride of Equidyne, Inc., a brokerage firm in Salt Lake City, Utah, had agreed to a firm underwriting of five hundred thousand dollars ($500,000.00) worth of GrAMM securities. However, plaintiff could offer no written memorandum relating to the alleged oral offer by McBride. Additionally, Mr. McBride testified at the trial that a condition of this firm underwriting was that GrAMM have its record album "up and going" prior to the time of the underwriting, and that it was customary, at some finalized point, for his firm to issue a written letter of intent.

There was conflicting testimony as to why the underwriting failed to materialize. McBride testified that GrAMM

"kind of avoided us and the deal just slipped away." With regard to who was at fault, McBride firmly stated, "They backed out; I didn't." James Cox, on the other hand, testified that McBride would not return his calls and insisted that the failure of the underwriting was caused by the defective pressing of the first batch of record albums.

From the evidence developed at trial with regard to the underwriting offer, it is difficult for this court to ascertain exactly why the underwriting did not go through. It is noteworthy, however, that Mr. McBride admitted that his firm did not have sufficient capital to purchase the underwriting,[1] and that in December of 1972, Equidyne was found to be in net capital violation by the Securities Exchange Commission. Equidyne, Inc. went into self-liquidation in February of 1973, according to Mr. McBride.

## CONCLUSIONS OF LAW

■ The court finds that the defendant company breached implied warranties of merchantability and fitness for a particular purpose, T.C.A. § 47–2–314 and § 47–2–315, in the first pressing of the record albums. Defendant also breached its express contractual agreement to produce records of high quality.

At the outset, the court finds that plaintiff Ralph Harrison's claim for breach of warranty is not cognizable under Tennessee law, since there was no privity between plaintiff Harrison and the defendant company.[2]

Plaintiff Harrison urges that T.C.A. § 23–3004, passed on April 10, 1972, abolishes the requirement of privity in this case.

■ However, in Ford Motor Company v. Moulton, 511 S.W.2d 690 (S.Ct.

Tenn.1974), cert. denied, 419 U.S. 870, 95 S.Ct. 129, 42 L.Ed.2d 109 (1974), the Tennessee courts held that the above statute abolishing the privity requirement is not to be retroactively applied.

Affirming the trial judge in the *Moulton* case, *supra,* the Tennessee Court of Appeals held in an unpublished opinion:

It is a well-accepted principle of statutory construction that statutes have only prospective application, unless the legislative intent that they be given retrospective application is clearly shown. Taylor v. Rountree, 83 Tenn. (15 Lea) 725 (1885). In the present case there is nothing on the face of the statute to indicate that it is to be applied retrospectively, and accordingly, we hold that it has only prospective application. Applying the rule laid down in Bates v. Shapard, 224 Tenn. 672, 461 S.W.2d 946 (1970), dealing with prospective application of an amendment to the statute of limitations affecting actions arising in connection with the sale of goods, *we find that T.C.A. § 23–3004 is intended to apply only to sales occurring after the effective date of the statute.* (emphasis added)

The dismissal of the warranty counts of the complaint on the above grounds was affirmed by the Supreme Court of Tennessee.

■ The *Moulton* case appears to be dispositive of the question of whether Mr. Harrison is required to be in privity in order to bring his suit for breach of implied warranty. The oral contract between GrAMM and Mid-South was made in early February of 1972, prior to the passage of T.C.A. § 23–3004. Thus, Tennessee law requires that plaintiff Harrison be in privity, Leach v. Wiles,

---

1. We recognize that there is a distinction between the amount of capital required by regulation to undertake a firm underwriting and that required to make an outright purchase of the stock offered.

2. Plaintiff Ralph Harrison had originally based his suit upon a tort theory of negli-

gence. However, defendant asserted the statute of limitations set out in T.C.A. § 28–304 as a defense. Plaintiff Harrison conceded in his trial brief filed September 30, 1974, that this defense is effective. By leave of court, plaintiff Harrison amended the pre-trial order so as to sue for breach of contract, rather than under a tort theory.

58 Tenn.App. 286, 429 S.W.2d 823 (1968), and Harrison's complaint must fail.

■■ Turning now to the cause of the corporate plaintiff GrAMM, the court finds no merit to defendant's contention that there was accord and satisfaction between the parties when defendant re-pressed the records. Under Tennessee law, it is essential that both parties intend to agree to an accord and satisfaction. Lichter v. B. Mifflin Hood Co., 198 F.2d 472 (6th Cir. 1952). In this case, GrAMM received no more than it was originally entitled to, and there was no proof that GrAMM intended to enter into an accord and satisfaction. Lytle v. Clopton, 149 Tenn. 655, 261 S. W. 664 (1924); Tullahoma Concrete Pipe Co. v. Pyramid Concrete Pipe Co., 46 Tenn.App. 559, 330 S.W.2d 578 (1969).

■ The court finds as a matter of law that plaintiff justifiably rejected the entire first pressing of the record albums as nonconforming goods. T.C.A. § 47–2–602. This rejection included the 12,000 records which had already been shipped out to ESA members and Gambit. Plaintiff notified the defendant of the defects as soon as it became aware of them, on the day it received initial shipment. The defective records had only negligible value as scrap, and defendant made no request that they be returned to it. The cost of retrieving the records already distributed would have greatly exceeded their value as scrap. Any revenue from the records that were shipped to ESA members appears to have been from the second "replacement" batch of records.

■ With regard to the second pressing of the record albums, the court finds that plaintiff GrAMM is liable on its open account with defendant in the amount of $13,025.39. Plaintiff's liability is predicated upon the fact that it accepted the repressed records and under T.C.A. § 47–2–607 must pay at the contract rate for goods accepted by it. The fact that plaintiff accepted the second batch of records does not, however, in any way preclude its suit for damages occasioned by the defective pressing of the first batch of records. The delivery of the second batch of records did not constitute a cure within the meaning of T.C.A. § 47–2–508, as the damage had already occurred and the time set for performance had expired.

Having previously determined that defendant Mid-South breached express and implied warranties, we now turn to the question of damages. Plaintiff GrAMM has elected to sue for breach of contract, rather than suing in tort for negligence. The damages recoverable for a breach of contract " . . . are limited to those reasonably within the contemplation of the defendant when the contract was made, while in a tort action a much broader measure of damages is applied." Prosser, Handbook on the Law of Torts, p. 613.

The standard measure of damages under the Uniform Commercial Code, as adopted in Tennessee, is not particularly helpful under the facts of this case. Under T.C.A. § 47–2–714(2):

The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted . . . .

In the instant case, no credible evidence was proffered to the court to reflect the difference between the value that the records would have had if they had been perfectly pressed the first time and delivered on time, as warranted, and the value of the repressed records which were delivered late, after some of the defective records had already been distributed.

Fortunately, the drafters of the Code anticipated such unique factual circumstances and added the following provision to § 47–2–714(2):

. . . unless special circumstances show proximate damages of a different amount.

Additionally, T.C.A. § 47–2–714(3) provides:

In a proper case any incidental and consequential damages under the next section may also be recovered.

T.C.A. § 47–2–715 explains what may be included as incidental and consequential damages:

(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charge, expenses or commissions in connection with effecting cover and *any other reasonable expense incident to the delay or other breach.*

(2) Consequential damages resulting from the seller's breach include

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) injury to person or property proximately resulting from any breach of warranty. (emphasis added)

According to Comment 4 to the above-quoted section:

The burden of proving the extent of loss incurred by way of consequential damage is on the buyer, but the section on liberal administration of remedies rejects any doctrine of certainty which requires almost mathematical precision in the proof of loss. *Loss may be determined in any manner which is reasonable under the circumstances.* (emphasis added)

With regard to certainty of proof required on damage questions generally, Tennessee law provides:

.  .  .  there is a clear distinction between the measure of proof necessary to establish the fact that plaintiff had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such damages as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount. (citation omitted) Acuff v. Vinsant, 59 Tenn.App. 727, 443 S.W.2d 669 at 674 (1969).

The question of allowable damages in this case is made more difficult by the speculative nature of the business venture undertaken by GrAMM. It is undisputed that Harrison had not demonstrated that his talents as a songwriter and artist had any appreciable market value prior to the production of the record, "Free Spirit Movin'." The proof clearly indicates the extremely hazardous nature of an undertaking to produce a "hit" record and create a "star" in the entertainment world.

Plaintiff GrAMM contends that the defective first pressing and resultant delay and confusion virtually destroyed the market for the "Free Spirit Movin'" album, and that Mid-South's breach also caused the failure of the firm underwriting of $500,000 by Equidyne. Plaintiff concedes that it is impossible to project with reasonable certainty what the future profits of the new corporation might have been. Instead, plaintiff asks for (1) the cost of laying the ground work for the manufacture and distribution of the album, including production costs of the record, plus advertising and promotional costs; (2) the cost of keeping the corporation going as a business entity from the date of the breach until the date that plaintiff finally had a successful public offering and began producing music for commercial use; (3) the capital lost from the projected underwriting which failed to materialize, less that realized from a subsequent stock offering; and (4) expenses allegedly incurred following the breach in an attempt by GrAMM to rehabilitate the record, including: advertising expenses, promotional salaries, telephone

costs, office supplies, payroll taxes, and salaries of management personnel and secretaries.

As previously noted, while the amount of damages may be approximated, the fact of damage attributable to the wrong must be proven with reasonable certainty. The court rejects the first two elements of damages propounded by the plaintiff, for the reason that the plaintiff did not prove to the court's satisfaction that there was ever any appreciable market for the record, nor that any such market was destroyed.

With regard to the existence of any market for the record, it is noteworthy that 32,000 of the 40,000 records pressed were to be shipped to ESA members as a promotional gimmick, with the request that $5.00 be remitted. The ESA members were, of course, under no legal obligation to pay the requested price for this unordered merchandise. 39 U.S.C. § 3010. There was no proof as to what percentage of the ESA members was likely to send in the requested price.

It was shown at trial that the usual practice among unknown artists in the record industry is to first put out a "single" record, as this is less expensive than an album. In this manner, the marketability of the artist can be tested prior to the production of an album. Ralph Harrison had never produced a single record, nor even performed professionally, prior to the production of the "Free Spirit Movin'" album. Therefore, the court must necessarily rely on the proof at trial with regard to the marketability potential of "Free Spirit Movin'."

James Fogelsong, President of Dot Records and an expert in the music field, testified that the lyrics and artist's performance in "Free Spirit Movin'" were not exceptional in any way; that its production was ordinary or worse; and that the musical instruments in the album "were not in time." Paul Perry, a disc jockey for a popular Nashville radio station, testified that he was impressed with the jacket of the album, but not with the ingredients of the record. He testified that he found no fault with the pressing of the album, and that the ingredients on the record couldn't measure up to the programming standards of his station in any event. He further testified that, in his opinion, the album "would not have had any major marketization," even with an initial pressing of highest quality.

Plaintiff offered no credible expert witnesses to refute the testimony of Fogelsong and Perry. No market survey or other reliable evidence with regard to market potential was introduced by plaintiff. Based upon the proof, the court concludes that no appreciable market existed for the "Free Spirit Movin'" album.

Although GrAMM proved the amount of its investment and the cost of operating its business during the period in question, it offered no convincing proof that, with an initial pressing of high quality, it would in all probability have sold a sufficient number of records to recoup its investment. "Ordinarily, damages are said to be speculative when the probability that a circumstance will exist as an element for compensation becomes conjectural." 25 C.J.S. Damages § 2. In the absence of credible proof that the album had a probability of success, the court cannot speculate that this would have been the case. In fact, the proof at trial convinced the court that the album had a far greater chance of failure than of success.

■ Even assuming, arguendo, that a market existed for the record album, there would be a question as to destruction of any such market by the initially defective first pressing. Fogelsong and Perry both testified that a record can be rehabilitated from an initially defective pressing. Perry testified that his usual practice, when he receives a defectively pressed record but finds the contents to have artistic merit, is to contact the company and ask for another copy. Perry indicated that he could judge the artistic merit of a record regardless of the

pressing. Perry also cited a specific example of a record that had originally been defectively pressed and had subsequently become a "big hit." Perry and Fogelsong both testified that defective pressings occur with some frequency in the industry, particularly since the fuel crisis has affected the vinyl supply in this country.

The law is well settled that the injured party is not to be put in a better position by a recovery of damages for breach of contract than he would have been in if there had been full performance. 25 C.J.S. Damages § 3. In this case, to grant plaintiff its entire investment in the album as damages for the breach by defendant would in all probability be to put GrAMM in a far better financial position than it would have been in had there been no breach. This the court will not do. It does not appear that plaintiff would have recouped the investment even if there had been no breach.

The court also rejects plaintiff's damages claim with regard to the failure of the $500,000.00 firm stock underwriting to materialize. First, the proof was not sufficiently clear as to why the underwriting did not go through. In absence of such satisfactory proof, the court cannot hold defendant liable for the failure.

Secondly, the court finds that such damages are too remote to have reasonably been within the contemplation of the parties at the time the contract was made. Although it appears from the proof that some mention was made of the stock offering in the conversation between GrAMM and Mid-South representatives, it does not appear that it was discussed in such detail that defendant would have had any idea that it might be held liable for the failure of the underwriting. As noted by the court in Baker v. Riverside Church of God, 61 Tenn.App. 270, 453 S.W.2d 801 (1970), in quoting from Squire et al. v. Western Union Telegraph Co., 98 Mass. 232 (1867):

A rule of damages which should embrace within its scope all the consequences which might be shown to have resulted from a failure or omission to perform a stipulated duty or service would be a serious hindrance to the operations of commerce and to the transaction of the common business life. The effect would often be to impose a liability wholly disproportionate to the nature of the act or service which a party had bound himself to perform and to the compensation paid and received therefore. 453 S.W.2d 801, 810.

In the case currently before the court, plaintiff asks damages in excess of $200,000 for breach of a $13,000 contract. The breach of the contract has not been satisfactorily proven to be the cause of the alleged loss. Certainly, these damages may not be allowed.

Under the circumstances peculiar to this case, the court finds the best measure of allowable damages to be the expenses reasonably incurred by GrAMM in its efforts to rehabilitate the record following the breach.

The court concludes that the following elements may be included in the expenses of rehabilitating the record:

(1) salaries and travel expenses of GrAMM representatives sent to Nashville to negotiate the re-pressing of the record album and act as GrAMM's quality control agents;

(2) salaries of other GrAMM employees for the period in which they were actively engaged in the rehabilitation of the record;

(3) extra mailing and handling costs attributable to the defective first pressing;

(4) reasonable telephone costs;

(5) advertising and promotional expenses reasonably incurred by GrAMM in rehabilitating the record; and

(6) a reasonable amount for office supplies and various other miscellaneous expenses.

The above elements of damages were not sufficiently separated from the rest of the damages alleged in the proof at trial to enable this court to set the amount of damages with any reasonable certainty. Therefore, the court directs the plaintiff to submit affidavits concerning the above elements of damages. Plaintiff shall furnish copies of such affidavits to defendant's counsel, and defendant shall have an opportunity to respond and except to plaintiff's affidavits.

Plaintiff is allowed fifteen (15) days for the submission of affidavits, and defendant shall have ten (10) days from the date such affidavits are filed with the Clerk of this court in which to respond and file counter-affidavits.

The court will review plaintiff's affidavits and defendant's responses thereto and will determine whether an additional hearing will be necessary in this cause.

An appropriate order shall be entered.