Garsh, J.
Plaintiff Lowell Paper Box Co., Inc. (“Lowell”) provided printed packaging materials to defendant Omni Resources Corporation (“Omni”). Following rejection of those materials, Lowell commenced this breach of contract action seeking the contract price. Omni counterclaimed for damages, alleging that the goods delivered by Lowell to Omni failed to conform to agreed upon specifications. A jury-waived trial followed.
FINDINGS OF FACT
Based on all the evidence I find to be credible, drawing such fair inferences as I find to be reasonable, and resolving questions of credibility where they occur, I find the following material facts:
On May 23, 1991, Omni ordered from Lowell, for delivery by June 14, 1991, a total of 118,000 software packaging folders intended to be used by Omni’s customer Prodigy Services Co. (“Prodigy”). The folders, known as the Prodigy “gold keepers,” included text, photographic images, and background colors and designs. With the purchase order, Omni provided to Lowell the films and proof to be used for the printing, showing the colors that Prodigy wanted used. The color of the sweater worn in the photograph by the female in the couple was blue; it was the same blue that is found on the sweater in the proof introduced as Trial Exhibit 19.
In early June 1991, Allan Maccarone (“Maccarone”), then Purchasing Manager of Omni, and Jane Scandurra (“Scandurra”), then Manager of Production at Prodigy, attended a press check at Lowell. At that time, Lowell printed press sheets, samples of the gold keepers. Maccarone and Scandurra inspected the press sheets for quality. Adjustments were made, following which Scandurra indicated Prodigy’s approval by signing certain press sheets, authorizing Lowell to print 118,000 Prodigy gold keepers that matched the quality of the approved press sheets. One approved press sheet was placed on the printing press to be used as a sample or model for the job so that the folders printed during the press run would match the quality of the approved press sheets. Scandurra and Maccarone each took an approved press sheet with them when they left Lowell’s print facility.
When the job was run, it was hot and very humid. As the printed sheets came off the press, they were stacked one on top of the other so that the printed side of the gold keeper was directly underneath the imprinted side of the folder stacked on top of it. The unprinted side should appear to be plain, white paperboard, but many of the folders from the lot at issue have black ink dots on the unprinted side in the area behind where the photographic images appear.
Photographic images printed using the four-color process, the process used by Lowell, can lack clarity, appear fuzzy and blurred, and have altered coloration if, among other things, the ink dots that are laid down onto the paper are pulled off the paper, a phenomenon known as ink “picking,” or if some ink dots smudge and rub onto the folder stacked on top of it, a printing problem known as “offsetting.” The ink dots appearing on the unprinted side of the gold keepers are evidence of ink picking, as are white spots evidencing an absence of ink which had appeared in the photographic images. Ink should be present in all areas of the photographic images.
On June 24, 1991, Lowell delivered 117,000 Prodigy gold keepers to Omni and an invoice for $36,014.46. A representative sample of eighty folders was selected and inspected by Omni in accordance with the agreement entered into between Lowell and Prodigy governing the kind, degree and frequency of allowable variations for gold keepers (the “Specification Agreement”).
Under the terms of the Specification Agreement, demerits may be assigned based on the nature and severity of the defect. A major defect earns one demerit, and a minor defect earns one-third of a demerit. For a lot size of 35,001 to 150,000 folders, the sample size is eighty folders. If that sample has eight or more demerits, the lot is rejectable. An incorrect hue (no more than ±l/2 tone variations of color if specified by PMS color chart) is a major defect as are any picks within one-half inch of the trade name or logo. Three or more picks per surface V32 of an inch or larger or *650 more than five picks per surface of any size constitute a minor defect. Smeared, blurred, streaked, broken or faded areas of type or graphics qualify as a major defect if sufficient to cause major aesthetic impairment and a minor defect if immediately noticeable. Incidental defects earn no demerits.
Having found at least eight demerits, and after ascertaining that Prodigy did not wish to use the gold keepers because it deemed them to be of unacceptably poor quality, Omni advised Lowell, on June 27, 1991, that Prodigy would not accept the gold keepers and that Omni rejected the lot. Omni promptly and seasonably notified Lowell of the rejection.
Lowell’s president told Omni that he thought the problem with the lot was due to the heat and humidity in the press room when the job was run. Lowell offered to rerun the job by August 30, 1991, at the earliest. After Prodigy advised Omni that it required the folders as soon as possible because it faced a possible stock-out, Omni contracted with Ames Safety Envelope Co. (“Ames”), for delivery of 100,000 to 110,000 folders by July 12, 1991. Lowell subsequently offered to rerun the job at the facilities of another printer, Hub Folding Box (“Hub”). Omni, accordingly, gave a contract to print 125,000 gold keepers to Hub. When Hub could not meet its promised delivery date, Lowell offered to rerun the job in-house, upon the condition that there be no press check. Omni, acting in good faith, would not agree to that condition; Lowell then refused to rerun the job. Omni obtained from Ames the additional gold keeper folders needed to satisfy Prodigy. In contracting with Ames for the manufacture of substitute folders, Omni acted in good faith and without unreasonable delay. Omni paid Ames for the substitute folders $4,235.40 less than the amount that it had agreed to pay Lowell.
In order to provide Ames with a sample of the required quality, Maccarone, whom I find to be completely credible, took the approved press sheet that he had retained from the Lowell press check, cut it in half, and gave to Ames the half of the sheet that contained Scandurra’s signature. Maccarone kept the other half of the press sheet; it was admitted into evidence as Trial Exhibit 5.
Maccarone spent a total of 128 hours in connection with the inspection and rejection of the gold keepers printed by Lowell and obtaining substitute folders. His salary at the time, calculated at an hourly rate, was $20.29. Maccarone conferred with C.J. Anand (“Anand”), Omni’s vice president for sales and marketing, on a daily basis (and often several times per day) about the rejection of the gold keepers and Omni’s efforts to obtain replacements.
Anand, who also was in communication with Prodigy, spent a total of 41.25 hours in connection with the rejection of gold keepers and obtaining substitute folders. His hourly rate was $62.50. Several other employees of Omni spent lesser amounts of time in telephone conversations and meetings, both internal and external, in connection with the receipt, inspection, rejection and replacement of the gold keepers. Matt Goldman, Omni’s New York salesperson responsible for the Prodigy account, spent a total of 16 hours; his hourly rate was $28.85.[1] Paul Johnson, Omni’s president, spent a total of 8 hours; his hourly rate was $72.11. Louise Gardner, Omni’s quality assurance inspector, spent a total of 10 hours; her hourly rate was $9.50. Mark Dupuis, the supervisor of the quality assurance department, spent 12 hours; his hourly rate was $16.18. In addition, Colin McLeod, Omni’s inventory manager, worked three hours in connection with receipt, care and custody of the rejected folders.
Omni incurred charges it would not otherwise have incurred for long-distance telephone calls, faxes, courier packages, out-of-town travel, and the like as a result of the rejection of the gold keepers. These expenses amounted to $2000.
Omni charges customers who store inventory at its warehouse a storage fee of twelve dollars per skid per month and an insurance fee of $4.95 per year per $1000 of productvalue. Omni’s storage and insurance rates reasonably reflect the cost to Omni, including overhead, for storage and insurance. The rejected lot consisted of nine skids with a declared value of $36,000. Omni requested Lowell to remove them from Omni’s premises. Lowell did not do so, nor did it request Omni to store or insure them. The rejected folders, which have no intrinsic value, have remained in Omni’s warehouse since the date of delivery. It was not reasonable for Omni to have stored or insured the rejected folders for more than sixty days.
A representative sample of eighty gold keepers was selected by Lowell’s counsel from the lot of 117,000 folders at issue according to the sampling procedures set forth in the Specification Agreement (the “Sample”). The parties have agreed that the Sample is to be the basis for determining whether Omni was entitled to reject the lot.
Maccarone determined that the sample contained 62% demerits. Of those demerits, more than forty were assigned due to incorrect sweater color. With respect to those folders, Maccarone, using the PMS color chart, determined that the color of the sweater varied more than +x/2 tone from the color on the approved press sheet. Maccarone also found that one folder (Exhibit 4A) had a yellow streak, meriting one demerit and that thirteen folders had ink picking, resulting in four and one-third demerits. Maccarone also assigned over fifty demerits for blurred photographs; he attributed the blurring to ink picking and offsetting.
The Sample has eight or more demerits.[2] The streaking in Exhibit 4A creates one demerit. I credit Maccarone’s testimony regarding picking and that results in four and one-third additional demerits. Finally, at least eight, and indeed far more than eight, *651 gold keepers in the Sample had an incorrect sweater color, meriting a full demerit each.[3] E.g., Exhibits 4D, V, OO, QQ, SS, EEE, UUU and WWW. The purple color of the sweater on these and additional folders was not just a variation of blue but did not appear to be blue at all. The hue was incorrect. It varied by more than +1/Í2 tone on the PMS color chart from the blue color which Lowell had agreed to print.
The Sample and, accordingly, the lot of gold keepers delivered to Omni by Lowell failed to conform to the quality criteria in the Specification Agreement. The Sample, and accordingly the lot, failed to conform to the quality standards of the approved press sheets. Omni was entitled to reject, and did reject, the lot of gold keeper folders as non-conforming goods. Lowell breached its contract with Omni on June 24, 1991, the date Lowell delivered the non-conforming folders.
Omni incurred damages resulting from Lowell’s breach of its agreement to deliver gold keepers that met the agreed-upon quality standards. The damages add up to $8,748.58, consisting of (a) the cost to Omni for the time spent by its employees on activities related to rejection of the gold keepers and obtaining replacement goods, which amounts to $6,502.88,[4] (b) out-of-pocket expenses totaling $2,000, and (c) costs incurred by Omni in connection with storing and insuring the rejected folders for a reasonable time, namely sixty days, which amounts to $216.00 and $29.70 respectively. These costs could not have been prevented by cover or otherwise. After subtracting the amount saved by Omni when it obtained replacement folders from Ames, the total loss to Omni resulting from Lowell’s delivery of non-conforming goods is $4,513.18, exclusive of interest.
RULINGS OF LAW
Under the Massachusetts Uniform Commercial Code, G.L.c. 106, §2-601 etseq. and general principles of contract law, a buyer is entitled to reject the delivery of nonconforming or defective goods. Pursuant to the Specification Agreement, Lowell agreed to provide to Omni goods that conformed to the quality standards set forth in that agreement.
A sample or model that is made part of the basis of the bargain creates an express warranty that the goods shall conform to the sample or model. It is not necessary to the creation of an express warranty that the seller use formal words such as warrant or “guarantee.” G.L.c. 106, §2-313(1)(c), (2). The approved press sheets were samples or models for the job that were made part of the basis of the bargain. Cf. Glyptal, Inc. v. Engelhard Corp., 801 F.Supp. 887, 895 (D.Mass. 1992). Lowell expressly warranted that the Prodigy gold keeper folders to be delivered to Omni would conform to the qualify of the approved press sheets it had provided to Omni. Omni was entitled to reject the gold keepers delivered by Lowell because they did not conform to the qualify of the approved press sheets and the number of defects in the Sample exceeded the number allowable under the Specification Agreement.
Rejection of nonconforming goods must be made within a reasonable time after their delivery, and the buyer must seasonably notify the seller of the rejection. G.L.c. 106, §2-602. Omni’s prompt rejection and notification thereof were sufficient to satisfy the statutory requirements.
Under G.L.c. 106, §2-712, and general principles of contract law, a buyer who rejects the delivery of nonconforming goods may “cover” by making, in good faith and without unreasonable delay, any reasonable purchase of goods in substitution for those due from the seller. Having rightfully rejected the nonconforming folders, Omni was not obligated to pay Lowell’s invoice for the folders and was entitled to cover for the nonconforming goods delivered by Lowell. Omni’s purchase of 117,000 substitute Prodigy gold keeper folders from Ames was proper cover.
A buyer who rightfully rejects nonconforming goods and effects cover may recover from the seller as damages the difference between the cost of cover and the contract price, together with any incidental and/or consequential damages, but less expenses saved in consequence of the seller’s breach. G.L.c. 106, §2-712(2). Incidental damages include expenses reasonably incurred in inspection, receipt, and care and custody of goods rightfully rejected, any commercially reasonable charges or expenses in connection with effecting cover and any other reasonable expense incident to the breach. G.L.c. 106, §2-715(1). Consequential damages include loss of prospective profits. Delano Growers’ Cooperative Winery v. Supreme Wine Co., 393 Mass. 666, 679-80 (1985).
The degree of certainty of proof of damages required is “reasonable certainty”; exact certainty is not required. G.L.c. 106, §1-106(1) states that “(t]he remedies provided by this chapter shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed.”
Omni lost a total of 207.25 hours of its employees’ services while its employees were engaged in actions resulting from the rejection. Other than the three hours spent by Colin McLeod, whose time should not be separately compensated in light of the award herein for costs incurred in the care and custody of the rejected folders, Omni is entitled to recover the value of those employee costs. Dale R. Horning Co., Inc. v. Falconer Glass Industries, Inc., 730 F.Supp. 962, 968 n.4 (S.D.Ind. 1990); Central Bit Supply, Inc. v. Waldrop Drilling and Pump, Inc., 717 P.2d 35, 38 (Nev. 1986); Great American Music Machine, Inc. v. Mid-South Record Pressing Co., 393 F.Supp. 877, (M.D.Tenn. 1975). The hourly wage of each Omni employee involved, multiplied by the number of hours each such employee was engaged in work resulting from the breach, is a reasonable basis by which to compute the value of Omni’s damages for lost services resulting from *652 Lowell’s breach. See Dale R. Horning Co., Inc. v. Falconer Glass Industries, Inc., 730 F.Supp. at 968 n.4.
Given the circumstances of this case, Omni is not entitled to recover overhead costs. No expert witness testified as to the reasonableness of the 250% overhead rate sought by Omni, and I do not find credible Anand’s testimony that Omni’s overhead costs equal 250% of its direct employee costs. Moreover, there was no evidence that items like rent, electricity, heat, water, etc. increased as a consequence of Lowell’s breach. To the extent that any of the fixed charges increased as a result of storage and insurance of the rejected goods, those items of overhead are included in the storage and insurance charges, items of damage awarded herein.
Omni did not show that a portion of its resources was unavailable for other projects due to the rejection, that other jobs which would have absorbed the overhead costs were available, or that the breach so affected its operations that it was not practical to undertake the performance of other work even if it had been available. Nor did Omni prove that any of the affected employees worked overtime or that it incurred any additional operating time, resulting in increased overhead. Omni offered no evidence that it would not have incurred the same overhead costs had there been no breach by Lowell. In order to be entitled to an award of overhead, there should be some showing that “such general overhead was not only an expense but also represented a loss ... no loss, no damage...” Kansas City Bridge Co. v. Kansas City Structural Co., 317 S.W.2d 370, 377 (Mo. 1958). See also Guy James Construction Co. v. Trinity Industries, Inc., 644 F.2d, 525, 533 (5th Cir. 1981) (home office overhead costs that would have been incurred regardless of breach not a proper item of damages); W.G. Cornell Co. v. Ceramic Coating Co., 626 F.2d 990, 994 (D.C. Cir. 1980) (overhead not to be awarded in the absence of evidence that claimant prevented from obtaining other jobs); Cives Corp. v. Collier Steel Pipe & Tube, Inc., 482 A.2d 852, 860 (Me. 1984) (buyer may not recover pro-rata share of overhead involved in in-house production of covering goods where it had failed to show that it had lost opportunities to perform other jobs which would have absorbed the overhead); Draft Systems, Inc. v. Rimar Manufacturing Inc., 524 F.Supp. 1049, 1056 (E.D. Pa 1981), aff'd, 688 F.2d 820 (3d Cir. 1982) (overhead properly awarded where additional plant operating time required in order to remedy breach); Chatlos Systems, Inc. v. National Cash Register Corp., 479 F.Supp. 738, 747-48 (D. N.J. 1979) (overhead costs of the powerline and maintenance of computer area not recoverable where the costs would have been incurred even if there had been no breach).
Having rightfully rejected the folders and having requested that Lowell remove them from Omni’s warehouse, Omni is entitled to recover the reasonable costs of storing and insuring the gold keepers. The price Omni charges to its customers for storage and insurance, which Omni has determined represents an accurate valuation of the costs to Omni associated with storage and insurance, represents a reasonable basis by which to estimate Omni’s costs of storing and insuring the rejected folders.
A buyer, however, is only under a duty to hold rejected goods “for a time sufficient to permit the seller to recover them . . .” G.L.c. 106, §2-602. Storage and insurance charges, like all incidental costs, are recoverable only if “reasonably incurred.” G.L.c. 106, §2-715. Care must be taken that the “calculation of damages . .. not overcompensate the buyer.” Delano Growers’ Cooperative Winery v. Supreme Wine Co., 393 Mass. at 680. Where, as here, the rejected goods are worthless, and could not be sold for the purpose intended either by the buyer or the seller, storage for over thirty-four months is unreasonable. Omni should not have retained the gold keepers, knowing that they were worthless. Cf. O’Brien v. Wade, 540 S.W.2d 603 (Mo. 1976). Sixty days was a sufficient period of time for Lowell to recover the gold keepers should it have wished to do so. Omni is entitled to storage and insurance costs for a reasonable period of time, namely sixty days.
Omni has established, to a reasonable certainty, that it suffered incidental damages as a result of Lowell’s breach of its agreement to deliver folders that conformed to the quality standards agreed to by the parties, less expenses saved in consequence of the breach, in the amount of $4,513.18, exclusive of interest. In a contract action, the nonbreaching party is entitled, as a matter of law, to interest at the rate of 12% per annum from the date of breach. G.L.c. 231, §6C. Omni is entitled to judgment against Lowell in the amount of $4,513.18, plus interest thereon at a rate of 12% per annum from the date of breach.
ORDER
The Court hereby ORDERS that the complaint be dismissed and it is further ORDERED that judgment on the counterclaim on behalf of Omni Resources Corporation be entered in the amount of $4,513.18 plus interest from June 24, 1991 and costs.

 In calculating Goldman’s hourly rate, I have used his base pay.

 Given the number of demerits attributable to ink picking and incorrect hue, it is not necessaiy to determine whether any or all of the blurring evident in the Sample is a “major” or “minor” defect or whether it is “incidental.”

 The finding that the lot exceeds the allowable number of demerits due to an incorrect sweater color does not depend upon the finding that Exhibit 5 is, in fact, the approved press sheet for this job. Any press sheet approved by Prodigy for thisjob contained an image of the couple in which the sweater was blue; it was the same color blue that Prodigy used on its outside packaging and in other printed promotional materials. Neither Omni nor Prodigy ever approved a press sheet for thisjob in which the color of the sweater appeared purple.

 This figure does not include Colin McLeod’s time spent in connection with the receipt, care and custody of the rejected folders. Omni’s storage charge takes into account such employee time.