686

PAUL HAWKINS, Complainant-Appellant, v.
EDWARD R. REYNOLDS, III, Defendant-
Appellee.—467 S.W.2d 791.

Middle Section. February 26, 1971.

Certiorari Denied by Supreme Court June 6, 1971.

Solon Fitzpatrick, Carthage, for complainant-appellant.

James L. Bass, Carthage, Cameron & Jared, Cookeville, for defendant-appellee.

TODD, J. The complainant, Paul Hawkins, has appealed from the chancellor's decree which dismissed complainant's bill against defendant, Edward R. Reynolds, III. Said bill sought recovery of damages or profits allegedly due complainant under a sharecrop lease of a farm.

There is no appreciable dispute as to the evidentiary facts. The only issue relates to the factual inferences or legal conclusions to be drawn from the evidentiary facts.

The grandmother of defendant, Mrs. Josie Reynolds, was formerly the owner of a valuable and productive farm adjoining the Cumberland River. About 1948, Mrs. Josie Reynolds and the complainant entered into an oral agreement whereby complainant moved to said farm and "worked it on shares." Said agreement provided for the sharing of certain expenses and income from crops which are immaterial to this suit. The parties agreed that the grain produced on the farm would be fed to cattle and hogs on the farm and that all expenses and profits on cattle and hogs should be shared equally.

The agreement was of only one year's duration. Either party was privileged to withdraw at the end of any year. However, the arrangement was satisfactory and profitable to both parties and was continued by consent, or at least acquiescence, or the parties until the death of Mrs. Josie Reynolds in 1964.

By the will of Mrs. Josie Reynolds, the farm became the property of defendant, Edward R. Reynolds, III, his sister, Jean Reynolds Penland, and his mother, Mrs. Erma Reynolds, as equal tenants in common. After the death of Mrs. Josie Reynolds, complainant remained on

the farm and continued to manage it with the consent or acquiescence of the owners.

On February 15, 1965, a "Cropland Conversion Agreement" was executed between the United States Department of Agriculture and "Josie Reynolds Estate" for the rental of 41.6 acres of pastureland for the years 1964-1965. The agreement was signed, "Josie Reynolds Estate by Erma A. Reynolds" as "operator" and by complainant, Paul Hawkins, as "other producer." Complainant, Paul Hawkins, received one half of the rental of $1,567.80 provided by said agreement. A renewal of this "Cropland Conversion Agreement" was in effect at the time of the happenings material to this suit.

On said farm, there was a low, marshy area known as "Myers Swamp." At some time not specified in the record, complainant and the owner or owners agreed with the Federal Government to excavate a pond or lake within said marsh. Complainant operated the bulldozer used to construct said pond and received one half of the contribution of the Federal Government to the construction cost.

At various times, minor parts of the farm were sold by the owners, but complainant did not participate in the proceeds except to the extent that a crop or "crop quota" was involved. On one occasion he received one half of a payment for "tobacco base" on a tract that was sold.

During the year 1966, in connection with the construction of Cordell Hull Dam nearby, the U.S. Corps of Engineers contracted with Dunbar and Sullivan to perform extensive dredging of the Cumberland River adjacent to the Reynolds farm. A representative of Dunbar and Sullivan approached complainant about de-

positing sand and gravel dredged from the river bed upon adjacent farms. Complainant undertook to assist Dunbar and Sullivan in getting agreements from various farm owners to allow sand and gravel to be deposited on their farms. Complainant was successful in negotiating one such arrangement with a Mr. Wright, the owner of a nearby farm, and complainant realized a substantial profit as a result.

Complainant first approached Mrs. Erma Reynolds about dealing with Dunbar and Sullivan. Later, defendant, Edward Reynolds, III, discussed the matter with complainant. Dunbar and Sullivan offered at first to rent an eight acre tract in Myers Swamp for two years at $100.00 per acre, per year. Complainant thought that he would get one-half of this rental, but no one told him he would get any part of it.

Negotiations continued with Dunbar and Sullivan from September 1966 until June 13, 1967, at which time, defendant, Edward R. Reynolds, III, signed a written agreement leasing to Dunbar and Sullivan for a period of two years, an eight acre tract in Myers Swamp with two 25 foot rights of way from said tract to the Cumberland River. The consideration stated in said lease agreement was ten dollars "and other good and valuable considerations." The agreement provided that a valuable drainage pipe would be installed and left on the premises. Although not mentioned in the written agreement, a part of the consideration was that defendant, Edward R. Reynolds, III, would receive title to all sand and gravel stored on the premises. Said agreement provided that "lessor" would clear the leased premises, but Dunbar and Sullivan subsequently paid complainant

$1,900.00 to clear vegetation from the eight acre tract with a bulldozer.

Complainant was present when said written agreement was negotiated and signed. Before it was signed, complainant and defendant went apart privately to discuss the matter, at which time complainant stated that he was willing to risk his half of the rental and that "we can sell the sand and gravel at a profit." Defendant responded that complainant had no part in the rental; that "there is no 'we' to it," and that he, defendant, had nothing further to discuss with complainant. Thereafter, the agreement was signed by defendant and Dunbar and Sullivan, only. Defendant testified that he "had an understanding" with his mother whereby he assumed full control of the dealings with Dunbar and Sullivan.

Subsequently, Dunbar and Sullivan began to dredge and discharge sand and gravel upon the leased premises. Defendant erected a fence around the area. There is some evidence that the fence included more than eight acres, that certain growing corn and hay were damaged by the operations of Dunbar and Sullivan, that the hogs and cattle were deprived of access to certain pastureland and the pond which was destroyed and filled by the dredging.

As a result of the dredging operation, complainant and defendant were required to make certain refunds to the Federal Government in respect to the cost of said pond and prepaid rental on pastureland. Defendant refunded $71.88 on the pond and $33.00 on the pastureland.

Approximately 127,000 cubic yards of sand and gravel were deposited on the farm by Dunbar and Sullivan. Defendant sold 100,000 cubic yards of said sand and

gravel for $18,000.00 cash and bulldozing work worth about $2,000.00, or a total consideration of $20,000.00.

Thereafter, complainant remained as tenant on the farm until the end of 1968, when he departed after being requested to do so by defendant.

The basis of complainant's claim is summarized by the following except from his cross examination:

"Q. If I understand you correctly then, sir, at the time this lease was made, Sonny was in complete charge and was the only one who signed the lease, at the time you were holding the land on a year to year basis, with the exception of those things with ASC, and that after this developed and you wanted half of the gravel you all sort of had a falling out and he never promised you half, or any other percentage, of the gravel. You completed the crop that year and the following year were given notice and were asked to move, is that correct?

A. Yes, sir, that's correct."

The substance of the original bill is that, because of the share-crop agreement between complainant and defendant, and particularly the "partnership" on cattle and hogs, the action of defendant in renting to Dunbar and Sullivan a part of the land required for the share-crop and livestock operation, defendant became liable under a "trust fund theory" to account to complainant for one half of the profits derived from the lease, to wit $10,000.00.

The answer of the defendant simply denies liability under such "trust fund theory."

After hearing oral evidence, the chancellor rendered an opinion containing the following:

"I do not recall any evidence, and my notes reflect none, as regards the value of what might have been produced on the approximate ten acres of land which was taken. It does appear that the complainant is entitled to be repaid his $71.00 which he was required to refund on account of the destruction of the pond. In addition thereto the complainant is entitled, as above noted, to the value of one-half of what he might have made from the use of the ten acres involved had it not been taken out of his possession and control. Furthermore, the complainant does not sue for the items hereinabove discussed, * * *

* * * * * *

"The complainant in his brief does not urge or suggest that he be granted a judgment for the loss of use of the land taken or for one-half of the cost of the pond.

"For the reasons set out in this opinion let the complainant's bill be dismissed at his cost."

On appeal, the complainant first insists:

"1. The Court erred in dismissing complainant's bill, because:

(a) The proof showed that the complainant had this land rented and that he had control of the farm and that they were partners in the livestock and that he had the right to use this land for the cattle and hogs which was leased to Dunbar & Sullivan wrongfully by the defendant and ousted the complainant, therefore, the complainant had the right to his share of the rent received for this land, which is one half of the value of

the sand and gravel put there, which is 127,000 cubic yards (B. E. p. 4) plus.''

Complainant cites 52 C.J.S. Landlord and Tenant sec. 798, pp. 723, 724 (now 52A C.J.S., pp. 329, 330), which contains the following:

''Except as provided otherwise by statute, a contract for the cultivation of land on shares generally does not constitute the parties partners unless they clearly manifest an intention to create a partnership.

\*     \*     \*     \*     \*     \*

''\* \* \* The general rule is that an ordinary contract between the owner of the land and persons who are to cultivate the land on shares does not constitute them partners in the transaction, in the absence of stipulations or evidence clearly manifesting a contrary purpose; nor does it create a joint adventure.

''However, the parties to the contract may so word it as clearly to make it constitute a partnership between them or a joint adventure, and, where they jointly engage in cultivating the land, the one furnishing the land and the other the labor and superintendence, sharing expenses between them, and agreeing to divide the profits, such agreement possesses every element of a partnership.

''It has been said that the relationship of landlord and tenant is not repugnant to a relationship of partnership as to certain activities on the farm, and that the lease may incorporate a partnership arrangement for owning and feeding livestock.''

In the same C.J.S. article at sec. 805b, pp. 340, 341 is found the following:

*"b. Damages and Evidence Thereof*

"A landowner breaching his contract to lease land on shares is liable for damages growing, directly and in the usual course of things, out of the breach.

"On breach of a landowner's contract to lease land on shares, he is liable for damages for the loss which the innocent party has sustained by reason of the failure of the landlord, growing immediately and directly out of the broken contract, such as arose naturally, according to the usual course of things, from such a breach of the agreement, or such as may reasonably be supposed to have been in the contemplation of the parties at the time they made the agreement as the probable result of the breach; but remote and speculative damages may not be recovered."

In the same C.J.S. article at sec. 353c (51C C.J.S. p. 891) is found the following:

"A tenant in possession suing to recover damages for injury to his use or occupation of the leased premises is as a general rule entitled to recover the depreciation in the rental value of the premises occasioned thereby from the date of such injury to the end of his term. * * *"

Said C.J.S. article contains no suggestion that, where a landlord wrongfully diverts part of the land to other uses, the tenant is entitled to a share of the profits derived by the landlord from such diversion. Complainant has cited no authority for such a rule.

Complainant cites Bogert Trusts and Trustees, 2nd Ed., Vol. 1, sec. 28, p. 233 as follows:

"If cotenant wrongfully takes and retains more than has share of the profits of the property owned, no doubt the injured party may hold the wrongdoer as a constructive trustee of the excess. This is not an express trust, but merely an implied trust used to remedy a wrong."

It will be noted, however, that it is retention of *profits of property owned* which constitute the wrongdoer a trustee. In the present case, complainant and defendant may have had a joint ownership of cattle or hogs, but never a joint ownership of the farm from which the profit was derived by storage of sand and gravel thereon.

Authorities are cited as to the duties and liabilities of joint tenants to each other, but these are deemed inapplicable.

Complainant insists that he had a right to elect to sue for his alleged share of profits from the sand and gravel storage, rather than for damages for loss in productivity of the farm. Since it has been held, supra, that complainant had and has no right to a share in the profits made by diverting the leased land to other uses, the right of election of remedies is no longer material.

The chancellor correctly held that the defendant (presumably acting for himself and the two other landlord-owners) did in fact wrongfully deprive the complainant-tenant of access to, possession of and use of a part of the leased premises, and that the complainant is entitled to damages for such breach of the lease agreement.

▮ The agreement which defendant negotiated with Dunbar and Sullivan involved the occupancy of land

beyond the term of complainant's lease and permanent alterations to the premises. The complainant could not under any theory claim the benefits or proceeds of the use of the land after the expiration of his lease, or of the permanent alteration of the land, except as such alteration affected the tenant's use of the land during his tenure as tenant.

■ ■ The measure of damages for breach of any contract is that which was reasonably contemplated by the parties. The general principle for assessment of damages for breach of contract is that the plaintiff is entitled to be placed, so far as can be done by money, in the same position he would have been in if the contract had been performed. Allen v. Elliott Reynolds Motor Co., 33 Tenn.App. 179, 230 S.W.2d 418 (1950).

■ The same rule applies to a contract for lease of land on a share-cropping basis. For breach of such a contract by the lessor, the lessee is entitled to recover the loss of any profits he might reasonably have made from the demised premises which were wrongfully withheld or withdrawn from his use. Fuqua v. Madewell, 25 Tenn.App. 140, 153 S.W.2d 133 (1941).

■ Thus, the complainant was entitled to the use and occupancy of the land which had been leased to him for the uses contemplated in the lease during the full period of the lease. By being deprived of the use of part of the land for the purposes contemplated by the lease (i. e., farming and livestock culture), complainant thereby would be entitled to recover all those profits and/or benefits which *he* would have reaped from said part of the leased farm if he had been allowed access to same during the remainder of his lease period.

As observed by the chancellor, supra, the complainant's bill did not specifically pray for a judgment for damages upon the foregoing theory, nor does the evidence support the allowance of any such damages with the possible exception of the money refunded to the Federal Government by complainant. However, final judgment in the pending appeal would doubtless preclude any further action to recover such damages. It is therefore deemed proper under the peculiar circumstances of the case to remand the cause for the reception of further evidence and the ascertainment of the amount of damages properly allowable to complainant for the admitted breach of the lease agreement. Secs. 27-326, 27-327, T.C.A.

For this purpose, the final decree from which appeal was taken is modified to delete the dismissal of the action. In all other respects, the decree of the chancellor is affirmed and the cause is remanded for ascertainment of damages consistent with this opinion. The costs of this appeal will be taxed one-half to appellant and one-half to appellee. Other costs will abide the final disposition on remand.

Modified, affirmed and remanded.

Shriver, P. J. (M.S.), and Puryear, J., concur.