IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 6, 2007

## HEATHERLY AWAD v. SELMA CURTIS

**Appeal from the Chancery Court for Montgomery County**
**No. MC-CV-CV-CD-02-20     Michael R. Jones, Judge**

_____

**No. M2005-00094-COA-R3-CV - Filed November 27, 2007**

_____

This is a breach of contract case. The parties executed a contract for the sale of a beauty salon whereby, according to one of the provisions, Seller agreed to work for Buyer for a specific amount of time. Seller quit before the specified period expired. Both parties sued for breach of contract. The trial court awarded damages to Buyer in the amount of $18,000.00. Seller appeals, asserting that the provision at issue was too indefinite to be enforceable and challenging the damages awarded Buyer. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., J., joined. WILLIAM B. CAIN, J., not participating.

Nick T. Tooley, Clarksville, Tennessee, for the appellant, Selma Curtis.

Thomas R. Meeks, Clarksville, Tennessee, for the appellee, Heatherly Awad.

**OPINION**

### I. FACTUAL BACKGROUND

In early 2002, Selma Curtis ("Seller") sought to sell her business, Legends Artistique Hair Salon ("Legends"). She had recently opened another establishment in another part of town, Upscale Hair Salon ("Upscale"). Heatherly Awad ("Buyer") expressed interest in purchasing Legends. Following negotiations, the parties entered into a Purchase and Sale Agreement on March 29, 2002, whereby Buyer would purchase the business, with its inventory, equipment, and supplies. Buyer agreed to pay a total of $30,000.00 for Legends, with a down payment of $18,000.00 and twelve monthly installments of $1,000.00 each.

On June 27, 2002, the parties executed three more documents relating to the conveyance. The first, an Asset Purchase Agreement ("Agreement"), conveyed the business and personal property

used in connection with the operation of the business. Such property used in connection with the operation of the business (including items such as coffee makers, coat hangers, plumbing, a tile floor, and pictures) was valued at $48,122.00. The Agreement indicated that all of the property related to the business would remain after the sale, save a few specified pieces that would leave with Seller. Again, the purchase price of the business and related property was $30,000.00. The Agreement contained the following relevant provisions:

> 1.    Sale of the Property
>
> . . . .
>
> (d) Seller agrees not to advertise her new Salon named Upscale Hair Salon at Legends Artistique Hair Salon, verbally or on the reader board located outside Legends Artistique Hair Salon.
>
> . . . .
>
> (f) Buyer requests Seller to work at Legends Artistique Hair Salon a maximum of one (1) year from July 1, 2002 for a maximum of four (4) days a week. After six (6) months, Buyer has the right to make the determination prior to January 1, 2003 if Seller's services are still required from the last six (6) months. Seller agrees to work in accordance with a flexible schedule between Seller and Buyer no more than thirty (30) hours per week unless agreed upon between Buyer and Seller or until Sellers services are no longer required.
>
> . . . .
>
> (j) In good faith, Buyer expects Seller to maintain the same level of professionalism and level of service as demonstrated in the last 12 months prior to Purchase Agreement . . . .

The second document, a Bill of Sale, covenanted that "the Seller owns and possesses the Personal Property; that the Seller has a good and lawful right to convey the Personal Property; and, that the Personal Property is unencumbered. The Seller further agrees to warrant and defend the title to the Personal Property against any lawful claims." Again, the purchase price of $30,000.00 is noted. The third document was a Promissory Note executed by Buyer to Seller guaranteeing payment of the balance of the transaction ($12,000.00). The first installment of $1,000.00 was due July 31, 2002. The Promissory Note also stated that a ten percent penalty would be assessed against any late payment by Buyer, following a fifteen day grace period, and that in the event of such late payment Seller had the right to demand immediate payment of the balance due. These documents were less than meticulous in their references to the property being conveyed. However, a fair reading indicates that the business, together with personal property connected with the business, was conveyed for a total purchase price of $30,000.00, even though the property connected with the business was valued at $48,122.00. In their briefs, the parties also interpret the arrangement as involving sale of the business and personal property for a total price of $30,000.00.

On July 1, 2002, Buyer took possession of Legends, and the parties' working relationship commenced. Almost immediately, the parties experienced difficulty in working together. Seller alleges that Buyer worked short and sporadic hours, never making any effort to maintain relationships with Legends existing customers. Similarly, Buyer alleges that Seller worked at

Legends for approximately one to two weeks over the period of an entire month, taking a two week vacation. The parties disagreed as to ownership of Legends retail items, valued at $1,200.00. Seller claimed ownership to the retail items pursuant to the Purchase and Sale Agreement. Buyer changed the locks on the doors, refusing to give Seller a new key. Further, Seller alleges that Buyer hired new employees resulting in less work for Seller, constantly criticized Seller's attire, and attempted to estrange Seller from some of her regular customers. Buyer did not make the first installment payment due on July 31, 2002.

Seller alleges that she found the working conditions at Legends to be so intolerable that, on August 7, 2002, she informed Buyer that she would no longer work there. On September 4, 2002, Buyer filed a Bill of Complaint in the Montgomery County Chancery Court alleging that Seller breached the contract between them and additionally maintaining that Seller had encouraged Legends customers to switch their allegiance to Upscale. Seller counter-sued for breach of contract. The trial took place without a jury on December 2, 2004. On December 8, 2004, the trial court issued an Opinion finding for Buyer. The Order, entered August 15, 2005, includes the following findings:

1.  On the 29th day of March, 2002, Plaintiff, Heatherly Awad and the Defendant, Selma Curtis, entered into a purchase and sale agreement whereby the Defendant, Selma Curtis, was selling the Plaintiff her ongoing beauty salon business, aka Legends Artistic Hair Salon, including inventory, equipment and supplies.

2.  There were exceptions to the contract, inclusive of all resale retail hair products (Exhibit 1).

3.  The litigants executed an amendment to the agreement clearly reflecting that the sale was a business opportunity and sale and purchase of Legends Artistic Hair Salon. (See Exhibit 10).

4.  On the 27th day of June, 2002, the litigants entered into an Asset Purchase Agreement (Exhibit 2).

5.  The Defendant agreed not to advertise her new salon verbally or on the reader board outside Legends Artistic Hair Salon. The issue in this case was the interpretation of paragraph 1F of the Asset Purchase Agreement. The Defendant denies that she was under a contractual obligation to work at Legends. The Court finds that the Defendant expressly agreed to work in accordance with a flexible schedule, no more than 30 hours per week.

6.  The Defendant placed an ad in the Leaf-Chronicle on June 29, 2002, (Exhibit 4) advertising her new business, Upscale Hair Salon prices and indicated that the Defendant would be working at Legends Artistic Hair Salon from 9:00 a.m. to 4:00 p.m. and at Upscale Hair Salon after 4:00 p.m.

7.   A fair reading of the advertisement would lead one to believe that the Plaintiff would be performing massages as an employee at Legends.

8.   On the 27th day of June, 2002, the Defendant executed a bill of sale to the Plaintiff for the personal property (See Exhibit 6).

9.   On June 27, 2002, the Plaintiff executed a note payable to the Defendant in the amount of $12,000 payable at the rate of $1,000 per month, with the first payment due July 31, 2002 (See Exhibit 7).

10.  On the 1st day of July, 2002, the Plaintiff took possession of Legends and began operating the business.

11.  On the 1st day of July, 2002, the Defendant worked from 10:00 a.m. to 2:00 p.m., on July 2, 2002, the Defendant worked 10:00 a.m. to 3:00 p.m., Defendant went on vacation from July 5 to July 9, 2002. On July 9, 2002, the Defendant worked from 9:00 a.m. to 4:00 p.m., on July 10, 2002, the Defendant worked from 1:00 p.m. to 4:00 p.m., on July 11, 2002, the Defendant worked from 1:00 p.m. to 3:00 p.m., on July 12, 2002, the Defendant worked from 12:00 p.m. to 4:00 p.m., on July 13, 2002, the Defendant worked from 9:00 a.m. to 1:00 p.m., on July 26, 2002, the Defendant worked from 9:00 a.m. to 12:00 p.m. and then had a dentist's appointment, on July 17, 18 and 19, 2002, the Defendant worked from 9:00 a.m. to 4:00 p.m. The Defendant then left for a two week vacation. On August 1, 2002, the Defendant returned and worked from 9:00 a.m. to 3:00 p.m., on August 2, 2002, the Defendant worked from 9:00 a.m. to 1:00 p.m., on August 3, 2002, the Defendant did not work. On August 6 and 7, 2002, the Defendant worked from 9:00 a.m. to 4:00 p.m.

12.  On August 7, 2002, the Defendant told the Plaintiff that she was no longer working for the Plaintiff. The Defendant has not worked for the Plaintiff since August 7, 2002. The Defendant was not fired. **The Court finds the Defendant specifically voluntarily quit.** (Emphasis added.)

13.  The Defendant testified that the Plaintiff was not utilizing the Defendant's management skills and knowledge of the business. The Defendant testified in court that two other ladies were her bosses and she felt that she had nothing to do because another employee was taking her clients.

14.  There is nothing mentioned in any of the agreements signed by the litigants for the sale of certain products. The litigants agreed during testimony that these products were to be sold, and the Defendant would receive her costs and the Plaintiff would receive the profit. The Defendant removed approximately $1,200 of these products without consulting the Plaintiff.

15. The Plaintiff paid a yellow page bill that was incurred by the Defendant prior to the agreement. The Plaintiff, according to the Defendant, made no demand upon her to pay this bill. The Defendant described this as a bill from a previous owner. At any rate, this bill did not enter into the Defendant's decision to quit working at Legends.

16. The Plaintiff had not paid the first note payment prior to the Defendant quitting and refusing to work at Legends Artistic Hair Salon.

17. Plaintiff testified that she still has the assets purchased under the asset purchase agreement. The Defendant has taken no action to secure possession of the secured items.

18. As an integral part of this contract, the Defendant agreed to work a minimum of 30 hours per week for a minimum period of 6 months. **Defendant breached the agreement by failing to work. The Defendant was not justified in quitting due to any of the reasons that she mentioned and testified to at the hearing. The Defendant, by quitting, deprived the Plaintiff of the benefit of her bargain. The Defendant further breached her contract by discussing with clients her new salon and requesting clients to come to the new salon.** (Emphasis added.)

19. Having determined that the Defendant breached the contract with the Plaintiff, the Court must determine what damages were incurred by the Plaintiff. The Court finds from the proof that the business dropped sharply when the Defendant quit. The damages that should be awarded are those that may fairly and reasonably be considered as arising out of the breach.

20. The business is closed. There is no evidence that the Plaintiff received any benefit from her down payment of $18,000. To place the buyer in as good a position as she was prior to the breach appears to be an equitable means of measure of damages. The promissory note executed by the Plaintiff to the Defendant is unenforceable due to the substantial breach of the contract by the Defendant and the Defendant shall be entitled to the return of all the items of personal property listed in Exhibit 2.

It is therefore ORDERED, ADJUDGED AND DECREED as follows:

1. That the Plaintiff is awarded a judgment against the Defendant in the amount of $18,000.00.

2. That the cross complaint filed by the Defendant and Counter Plaintiff is dismissed.

Further, the trial court provided its own Statement of Evidence detailing the proceedings, appearing below:

The Complainant presented the following testimony:

1: Selma Curtis: Exhibit 1 is a purchase and sale agreement. Exhibit 2 is an Asset Purchase Agreement that my real estate agent prepared. The first week after the buyer took over, I worked. I then took 2 weeks vacation. I worked 8 more days and then quit. The buyer told me to take my merchandise so I did. Exhibit 3 is a list of the merchandise that I took. I was never approached about the "yellow page" bill. I left because they were taking my clients and I had nothing to do. The buyer put Cheryl and Shannon as my boss. I told the buyer that I was quitting. Exhibit 4 is the newspaper advertisement that I placed in the paper. The buyer brought me the picture. Exhibit 5 is a confirmation of agency status. Exhibit 6 is the Bill of Sale. Exhibit 7 is the promissory note executed by the buyer. I received no monthly payments.

2: Heather Awad: I took over the shop on July 1st. The Seller worked 10 to 2 on that date. On July 2nd, she worked 10 to 3. The Seller was on vacation from July 5 until July 9. On July 9, the Seller worked 9 to 4; on July 10th, she worked from 1 to 4; on July 11th, she worked from 1 to 3; on July 12, she worked from 12 to 4; on July 13, she worked from 9 to 1; on July 16, she worked 9 to 12 and then went to a dentist appointment; on July 17th, 18th and 19th, she worked 9 to 4. On July 18th, the Seller told me she was going on vacation for 2 weeks. Cheryl asked someone to fill in for us. We had to pay her $300.00. On August 1st, the Seller returned and worked from 9 to 3; on August 2nd, she worked 9 to 1; on August 3rd, she did not work; on August 6th, she worked 9 to 4. On August 7th, the seller quit. The buyer did not agree that the seller could quit. Exhibit 8 was identified as a book that was kept concerning the hours worked. Monday was day off. The buyer had a written dress code and gave each person written notice of the dress code. The seller did not abide by the dress code. The seller violated the dress code day after day by wearing see through blouses. The seller was very friendly with her clients. During the few hours that she was there, she would receive telephone calls while she was working with a client. The seller would take the telephone outside and have her conversations. I talked to her on 2 or 3 occasions about that. After August 7th, business dropped drastically. We had none of her former clients; we received no telephone calls asking for the seller. In reference to the newspaper advertisement, the seller approached me and told me that she wanted to do this as a gift for me and that she needed a picture. I provided the picture but told the seller that I wanted to see the ad prior to its publication. I did not see the ad until it had run in the newspaper. I did not pay the August monthly payment because I could not afford it after she left. The seller told the buyer that "this is not my problem." On July 3rd, the Seller called the buyer and told her that she (buyer) took the merchandise because she could not afford to buy new merchandise. The agreement was that the seller was to get her cost from these products and the buyer was to receive the profit. The yellow page bill was

never discussed prior to my receiving the bill. The bill indicated October 02 for Legends in the amount of $655.00. The seller stated that she felt that I needed the yellow pages ad. The first payment was due on July 31st. I did not make the payment because it was still in the grace period. Exhibit 9 is the security agreement. I did sell shampoo and conditioner to Avante. Cheryl now works at Avante. I still have the equipment. Exhibit 10 was prior to the contract.

3. Cheryl Milyo Laird: I was the hair dresser manager. The seller did tell customers about her new business on Madison Street. Buyer was upset about the advertisement.

4. Mrs. Dale Jackson: I heard the Seller tell a client that she had another salon in the Sango area. The seller was not talking to me.

5. Barbara Grinsley: The Seller mentioned to me that she was opening a new salon on Madison Street and wanted me to come there. The Seller wanted me to do more than just a hair cut. The Seller told me that she was trying to get her clients to go with her to the new salon.

6. Dorothy Bartholomai: Seller told me that she had sold business. She said that she would stay there for awhile, and then she wanted me to go to her new business.

7. Shannon Harris: I am employed at Nail Tech. The seller told me that she had a new salon and said it was "better to come and visit with her at the new salon. Business did go down after the Seller left. The Seller did not say come to the other store.

The Buyer rested her case.

The Seller presented the following testimony:

1. Selma Curtis: I did not have to work those hours. If there were no clients, I did not work.

2. Virginia Ryder: I followed Selma from Legends to Upscale. The seller did not ask me to change. I saw it in the newspaper.

3. Shirley Hill: I always go to Selma. The seller did not solicit me to change locations.

There was no further testimony presented.

Seller presents three issues on appeal, specifically, whether the trial court erred in (1) finding that Seller had breached the contract entered into by the parties; (2) awarding Buyer a total of $18,000.00 in damages while denying any kind of legal or equitable relief to Seller; and (3) voiding the Promissory Note executed by Buyer[1].

## II. STANDARD OF REVIEW

Review of the trial court must be in conformance with Tenn. R. App. P. 13(d), which states that "review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. . . ." Tenn. R. App. P. 13(d). "The review of a question of law is de novo, with no presumption of correctness afforded to the conclusions of the court below." *King v. Pope*, 91 S.W.3d 314, 318 (Tenn. 2002).

## III. BREACH OF CONTRACT

Seller alleges that the provision giving rise to the dispute, namely, paragraph 1(f) of the Agreement, is "void for vagueness and for an indefiniteness of its essential elements." Seller maintains that the Agreement, while obligating her to work for Buyer, fails to address key elements such as the nature of the work to be performed and the role Seller is expected to play in the maintenance of the business. Seller argues in her appellate brief that "[t]he lack of specificity regarding the nature of the work Mrs. Curtis was to perform, coupled with the open-ended requirement that her work schedule be 'flexible' and the result of agreement between the parties, almost assured that misunderstandings and deadlock would arise." In summary, Seller maintains that paragraph 1(f) of the Agreement is unenforceable due to its lack of specificity regarding certain

---

[1]Seller's third issue stated on appeal is never directly addressed within the analysis portion of her appellate brief. As asserted by Buyer, this issue is thereby waived pursuant to Rule 6(b) of the Rules of the Court of Appeals of Tennessee, which states the following:

> No complaint of or reliance upon action by the trial court will be considered on appeal unless the argument contains a specific reference to the page or pages of the record where such action is recorded. No assertion of fact will be considered on appeal unless the argument contains a reference to the page or pages of the record where evidence of such fact is recorded.

Tenn. R. Ct. App. 6(b) (2006). As noted by this Court in *Brummitte v. Lawson*, 182 S.W.3d 320 (Tenn. Ct. App. 2005),

> Rule 6(b) of the Rules of the Court of Appeals provides in pertinent part that "[n]o assertion of fact will be considered on appeal unless the argument contains a reference to the page or pages of the record where evidence of such fact is recorded." As we have previously stated, "this Court is under no duty to blindly search the record in order to find proof to substantiate the factual allegations of the parties or any other evidence to support a party's contentions." *Pearman v. Pearman*, 781 S.W.2d 585, 588 (Tenn. Ct. App. 1989). Failure to comply with the Rules of this Court results in a waiver of the issue raised. *Bean v. Bean*, 40 S.W.3d 52, 55 (Tenn.Ct.App.2000).

*Brummitte*, 182 S.W.3d at 323. Therefore, Seller's third issue is waived.

factors. Further, Seller maintains that Buyer failed to make even the first monthly installment pursuant to the Promissory Note.

This case boils down to the interpretation of the Agreement between the parties. As the Tennessee Supreme Court has noted:

> The interpretation of written agreements . . . is a matter of law that this Court reviews de novo on the record according no presumption of correctness to the trial court's conclusions of law. *See Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999); *Union Planters Nat'l Bank v. Am. Home Assurance Co.*, 865 S.W.2d 907, 912 (Tenn. Ct. App. 1993). A cardinal rule of contract interpretation is to ascertain and give effect to the intent of the parties. *Christenberry v. Tipton*, 160 S.W.3d 487, 494 (Tenn. 2005). In interpreting contractual language, courts look to the plain meaning of the words in the document to ascertain the parties' intent. *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002). This Court's initial task . . . is to determine whether the language is ambiguous. *Id.* at 890. If the language is clear and unambiguous, the literal meaning controls the outcome of the dispute. *Id.* If, however, the words in a contract are susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language. *Id.*

*Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006).

The provision at issue details the time frame for Seller to work for Buyer, including dates, deadlines, and limitations. The portion allowing for flexible schedules was likely inserted for the convenience of the parties involved, as well as in anticipation of the changing hours required by the nature of the salon business. The bottom line remains that Seller contracted to work for Buyer for at least six months. This Court believes that the provision is sufficiently specific to alert both parties to its meaning; any other interpretation is unfounded. The language establishing Seller's obligation to work is clear. The fact is Seller quit shortly after Buyer took over the business. In other words, the conduct found to constitute a breach of contract was a refusal to work at all. This is not a question of whether Seller worked enough hours per week or whether her hours were too flexible, so this Court is not called upon to interpret the specifics of Seller's agreement to work for Buyer.

Seller focuses on the use of the word "request" at the beginning of the provision, arguing that such term indicates a lack of definiteness. We do not agree. Seller accepted the terms, including Buyer's request that Seller continue to provide services at the salon.

The trial court heard testimony from numerous witnesses before ruling that Seller breached the Agreement. The credibility afforded witnesses by the trial court is a factor in this Court's determination to uphold the trial court's ruling. At trial, both parties were given the opportunity to give their own version of the facts regarding the treatment of Seller and the working relationship between the parties. Further, former employees and customers of Legends testified regarding whether or not Seller solicited business for Upscale while working for Buyer at Legends. Each party

presented witnesses in support of her position, and the trial essentially became a swearing contest between witnesses. When dealing with credibility determinations, this Court has stated:

> One of the most time-honored principles of appellate review is that trial courts are best situated to determine the credibility of the witnesses and to resolve factual disputes hinging on credibility determinations. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990); *Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1989). Accordingly, appellate courts routinely decline to second-guess a trial court's credibility determinations unless there is concrete, clear, and convincing evidence to the contrary. *See Bingham v. Dyersburg Fabrics Co., Inc.*, 567 S.W.2d 169, 170 (Tenn. 1978); *Thompson v. Creswell Indus. Supply, Inc.*, 936 S.W.2d 955, 957 (Tenn. Ct. App. 1996).

> The most often cited reason for this principle can be traced to the fact that trial judges, unlike appellate judges, have an opportunity to observe the manner and demeanor of the witnesses while they are testifying. *See Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). There are, however, other reasons for this principle. As the United States Supreme Court has observed:

>> The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources. In addition, the parties to a case on appeal have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the facts is the correct one; requiring them to persuade three more judges at the appellate level is requiring too much.

> *Anderson v. City of Bessemer City*, 470 U.S. 564, 574-75, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

> . . . .

> Embarking on independent appellate credibility determinations would be a drastic change in the settled principles of appellate review.

*Mitchell v. Archibald*, 971 S.W.2d 25, 29-30 (Tenn. Ct. App. 1998). "Our search for the preponderance of the evidence is tempered by the principle that the trial court is in the best position to assess the credibility of the witnesses; accordingly, such credibility determinations are entitled to great weight on appeal." *Rice v. Rice*, 983 S.W.2d 680, 682 (Tenn. Ct. App. 1999). Therefore, this Court defers to the trial court's credibility determinations.

The trial court found that Seller breached the parties' agreement by failing to work and that her quitting was not justified by any of the reasons she posited. The trial court also found that Seller

committed an additional breach by requesting that clients come to her new salon. These breaches, according to the trial court, deprived Buyer of the benefit of her bargain. The evidence does not preponderate against the trial court's findings. Accordingly, we affirm the trial court's holding that Seller breached the contract.

## IV. REMEDY

Having found the contract enforceable and having affirmed the trial court's finding that Seller breached the agreement, we must now address the issues regarding the trial court's remedies. The trial court's remedy had three components. First, the court awarded Buyer damages in the amount of her down payment, $18,000. The trial court also found the Promissory Note Buyer had executed for the remainder of the purchase price unenforceable, thus relieving Buyer of that obligation, and also ordered the property listed in the Asset Purchase Agreement (essentially the shop's equipment) returned to Seller.

Seller argues that the trial court rescinded the contract and that rescission was not an appropriate remedy. While the totality of the trial court's remedies may have operated to return the parties, as nearly as possible, to their pre-contract position, we do not agree with Seller's characterization of the trial court's actions. The trial court explicitly found Seller had breached the agreement. In constructing a remedy for Seller's breach, the trial court specifically stated, "Having determined that the Defendant breached the contract with the Plaintiff, the Court must determine what damages were incurred by the Plaintiff." The court further held "a judgment is granted the buyer against the seller in the amount of $18,000.00." This language clearly indicates the court intended to award damages for breach and not to invoke the equitable remedy of rescission.

The question, therefore, is whether the trial court applied the correct standard for calculating and the evidence in the record in arriving at the damages it awarded. The court's order, entered August 15, 2005, includes the following analysis:

> The Court finds from the proof that the business dropped sharply when the Defendant quit. The damages that should be awarded are those that may fairly and reasonably be considered as arising out of the breach. . . . The business is closed. There is no evidence that the Plaintiff received any benefit from her down payment of $18,000. To place the buyer in as good a position as she was prior to the breach appears to be an equitable means of measure of damages.

The trial court properly recognized that the purpose of damages for breach of contract is to compensate the nonbreaching party for injury caused by the breaching party's conduct. *Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42, 57 (Tenn. Ct. App. 2004). That includes such damages as are incidental to or directly caused by the breach.

It appears that the trial court determined in the August order that the appropriate measure of damages was the amount necessary to place Buyer in as good a position as she was prior to Seller's breach. However, in its Opinion, entered December 8, 2004, the trial court, in addition to the statement above, also found:

-11-

The general law is that the buyer would be entitled to be placed in as good a position as would have been occupied had the contract been fulfilled. If the seller had remained, it is unknown whether or not the salon would have been profitable. Certainly the proof is that business dropped sharply when the seller quit. The damages that should be awarded are those that may fairly and reasonably be considered as arising out of the breach.

The trial court's first enunciation of the applicable measure of damages was a little off the mark. However, its later pronouncement was a correct statement of the measure of damages.

The purpose of assessing damages in a breach of contract suit is to place the plaintiff, as nearly as possible, in the same position he would have been in had the contract been performed. *Chambliss, Bahner & Crawford v. Luther*, 531 S.W.2d 108 (Tenn. App. 1975), and *Hawkins v. Reynolds*, 62 Tenn.App. 686, 467 S.W.2d 791 (1971). However, it is well settled law that the injured party is not to be put in a better position by recovery of damages for breach of contract than he would have been in if the contract had been fully performed. *Great American Music Machine, Inc. v. Mid-South Record Pressing Company*, 393 F.Supp. 877 (M.D. Tenn. 1975).

*Action Ads, Inc. v. William B. Tanner Co., Inc.*, 592 S.W.2d 572, 575 (Tenn. Ct. App. 1979).

Thus, the damages should have been based on a determination of the Buyer's position had the contract been performed according to its terms. That is different from the Buyer's position before the breach. The trial court did not make any calculations or reference any evidence regarding the Buyer's position had the contract been performed, *i.e.*, what Buyer would have made (or lost) had Seller continued to work at the salon and not otherwise breached the agreement. A review of the statement of the evidence explains why.

In her complaint, Buyer asked for compensatory damages in the amount of $20,000 in addition to an undetermined sum for damages "as to the loss of business future." It is important to note that Buyer has not appealed the amount of damages actually awarded as insufficient.

Carefully reading Seller's brief in this appeal, we do not find an objection to the amount of damages either. Instead, Seller argues the trial court rescinded the contract and that rescission is not appropriate in this case. Seller also argues that the judgment of the court did not achieve equity because "[t]he result of the trial court award to the [Buyer] has been to free her of any of the financial burden associated with the closing of the business while leaving her with all of the tangible assets associated with that business, specifically those items listed in the inventory attached to the Asset Purchase Agreement. . . ."

On appeal, Seller argues that "the Trial Court should have ordered the Buyer to restore Mrs. Curtis the equipment valued at forty-eight thousand one hundred twenty-two dollars ($48,122.00) which was conveyed to her at the time of the sale." Seller has apparently overlooked that portion of the court's order that deals with the equipment. In fact, the trial court's Order states "the Defendant shall be entitled to the return of all the items of personal property listed in Exhibit 2."

Exhibit 2 is the Asset Purchase Agreement, with the personal property associated with the business listed in Exhibit A. Thus, Buyer was instructed to return Seller's personal property associated with the business.

## V. CONCLUSION

The evidence in the appellate record does not preponderate against the trial court's findings. Seller breached the Agreement between the parties by refusing to work for Buyer at Legends for the time period specified in the Agreement and by encouraging customers to come to her new salon. The judgment of the trial court is affirmed, and costs of this appeal are taxed against Appellant, Selma Curtis.

_____
PATRICIA J. COTTRELL, JUDGE